Philip M. Black (SBN 308619)
**WOLF POPPER LLP**
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Email: pblack@wolfpopper.com

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOWARD MILLER, | CASE NO. 8:24-cv-1288 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | 1. VIOLATION OF THE WIRETAP ACT; |
| HYUNDAI MOTOR AMERICA, and VERISK ANALYTICS, INC. | 2. VIOLATION OF THE FAIR CREDIT REPORTING ACT; |
| Defendants. | 3. UNJUST ENRICHMENT; |
| | 4. VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT; |
| | 5. VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT. |
| | **DEMAND FOR JURY TRIAL** |

Plaintiff Howard Miller ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his counsel, brings this action against Hyundai Motor America ("Hyundai") and Verisk Analytics, Inc. ("Verisk") (each a "Defendant" and together "Defendants"), and alleges on information and belief, except as to the allegations that pertain to Plaintiff, which are based on personal knowledge, as follows:

## INTRODUCTION

1.    In March of 2020, Hyundai began surreptitiously collecting its customers' driving behavior data through its "Driving Score" program, and selling that data to Verisk, a data broker. Verisk then sold the data to insurance companies, which have used the data as justification to increase drivers' auto insurance rates. Drivers were not required to explicitly and specifically consent and opt into the Driving Score program, nor were they advised that Defendants would sell their driving behavior data to insurance companies.

2.    Plaintiff bought a Hyundai Ioniq vehicle in April 2022. Plaintiff was never specifically told about, nor asked to give his informed consent to, the collection and disclosure of his driving behavior data by Hyundai or Verisk.

3.    On March 11, 2024, *The New York Times* published an exposé entitled "Automakers Are Sharing Consumers' Driving Behavior With Insurance Companies," in which Hyundai and Verisk were outed as two of the companies snooping on drivers and profiting from their driving behavior data. That same day, Hyundai suspended its Driving Score program, and a few weeks later, on April 9, 2024, discontinued it completely. Hyundai's decision to publicly cut and run from the Driving Score program immediately after it was profiled in *The New York Times* shows that Hyundai and Verisk were relying on lack of driver awareness about their conduct of profiting off of customers' personal information.

4.      Verisk has colluded with Hyundai and other automakers to intercept drivers' driving behavior data and sell it to insurance companies, to Defendants' benefit and drivers' detriment. Defendants' conduct is deceptive, unfair, and illegal, as further alleged herein.

## **PARTIES**

5.      Plaintiff Howard Miller is a citizen of the United States and is domiciled in the State of California.

6.      Defendant Hyundai Motor America is a California corporation headquartered in Fountain Valley, California. Hyundai is a subsidiary of Hyundai Motor Company, a South Korean corporation headquartered in Seoul, South Korea. Hyundai designs vehicles in its California Design & Research Center in Irvine, California. Hyundai sells (through dealerships) Hyundai, Genesis, and Ioniq brand vehicles throughout the United States.[1] In addition to its corporate headquarters, Hyundai's vehicle design department, and consumer affairs departments are located in California. "[T]he Hyundai Design and Technical Center is located in Irvine, Calif." and "is home to Hyundai automobile designers, engineers, model-makers and technicians. Facility operations are focused on designing cars for the North American market."[2] Hyundai's decision to enter into a telematics agreement with Verisk was made in California.

7.      Verisk Analytics, Inc. is a Delaware corporation headquartered in Jersey City, New Jersey. Verisk stock is listed on the Nasdaq exchange (ticker: VRSK) and is a component of the Nasdaq-100 and S&P 500 stock indices. Verisk describes itself as "a leading strategic data analytics and technology partner to the

---

[1] https://www.hyundaiusa.com/us/en/our-company (last accessed May 16, 2024).

[2] "Hyundai Design and Technical Center - Irvine California," https://www.hyundainews.com/en-us/releases/1250 (last accessed May 16, 2024).

global insurance industry."[3] According to Verisk's 2023 Form 10-K filed with the U.S. Securities and Exchange Commission, Verisk's New Jersey headquarters occupy more square footage than the rest of its other two U.S. offices combined. As alleged herein, Verisk did not interact with consumers directly, but instead colluded with Hyundai to obtain driving behavior data from Hyundai's California headquarters, and which it then sold to auto insurance companies. Verisk has made public statements about its telematics business from its Jersey City, New Jersey headquarters.

## **JURISDICTION AND VENUE**

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States. This Court has supplemental jurisdiction over the state law claims raised herein pursuant to 28 U.S.C § 1367 because those claims are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy.

9.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), because this action is a class action in which there are 100 or more Class members; the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; and Plaintiff, a member of the Class, is a citizen of a state different from Defendants.

10.     This Court has personal jurisdiction over Defendants because each Defendant transacts substantial business in California; maintains substantial contacts in California; and committed the violations alleged herein, at least in part, in California.

---

[3] https://www.verisk.com/company/newsroom/verisk-fact-sheet/ (last accessed May 16, 2024).

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant Hyundai is headquartered in this District and a substantial portion of the acts complained of took place in this District.

## **FACTUAL ALLEGATIONS**

Hyundai Collects Driving Behavior Data

12.     Auto insurance premium rates have been surging in recent years.[4] Behind the scenes of these auto insurance premium rate hikes is the surreptitious collection and sale of customer driving behavior data, which insurance companies use as a justification for raising premium rates. Unbeknownst to Plaintiff, and to many thousands of drivers of Hyundai, Genesis, and Ioniq branded vehicles, their vehicles have in fact been monitoring their driving and transmitting their driving behavior data. Hyundai receives the driving behavior data and sells it to data brokers, such as Verisk, who then sell that data to auto insurance companies, who in turn can use the data to increase drivers' auto insurance rates.

13.     The collection and transmission of driving behavior data is sometimes referred to as "telematics." Webster's Dictionary defines telematics as "the combination of information technology with telecommunications; especially: the integration of telecommunications networks in vehicles (as for collecting data on performance)."

14.     Consumers have been reluctant to adopt monitoring programs offered by auto insurance companies. Instead, as reported by *The New York Times* on March

---

[4] "Insurers Rake In Profits as Customers Pay Soaring Premiums," Wall St. J., Jan. 25, 2024, https://www.wsj.com/finance/insurance-companies-profits-stock-ebae7fd1 (last accessed May 16, 2024); "Your Car May Snitch On Your Driving, Raise Your Insurance Costs," Kelly Blue Book, March 11, 2024, https://www.kbb.com/car-news/your-car-may-snitch-on-your-driving-raise-your-insurance-costs/ (last accessed May 16, 2024).

11, 2024, "Car companies are collecting information directly from internet-connected vehicles for use by the insurance industry."[5]

15.    Drivers are unaware that their data is being collected and sold. Per *The New York Times*, "[m]odern cars are internet-enabled, allowing access to services like navigation, roadside assistance and car apps that drivers can connect to their vehicles to locate them or unlock them remotely. In recent years, automakers, including [among others] Hyundai, have started offering optional features in their connected-car apps that rate people's driving. Some drivers may not realize that, if they turn on these features, the car companies then give information about how they drive to data brokers . . . [T]he existence of these partnerships is nearly invisible to drivers, whose consent is obtained in fine print and murky privacy policies that few read. . . . Even for those who opt in, the risks are far from clear. . . ."[6]

16.    Hyundai admitted to *The New York Times* that it offered a program called "Driving Score," which, "when turned on, collect[s] information about people's mileage, speed, braking and acceleration that is then shared with . . . Verisk." However, according to *The New York Times*, "that would not be evident or obvious to drivers using th[is] feature[]."[7]

17.    Hyundai's Driving Score program began in 2020, in partnership with Verisk. In a News Release dated March 29, 2020 issued from Hyundai's corporate headquarters in Mountain View, California, Hyundai stated that "[t]hrough leading global data analytic provider, Verisk (Nasdaq:VRSK), Hyundai drivers are now able

---

[5] "Automakers Are Sharing Consumers' Driving Behavior With Insurance Companies," N.Y. Times, March 11, 2024, https://www.nytimes.com/2024/03/11/technology/carmakers-driver-tracking-insurance.html (last accessed May 16, 2024).

[6] *Id.*

[7] *Id.*

to share their driving behavior habits with insurers." In a section titled "How It Works," the News Release said, "Hyundai drivers can now access a new Driving Score tool, available through Hyundai Blue Link and powered by Verisk's analytics. The new feature provides a personalized Driving Score and helpful safe driving recommendations. Verisk has developed these insights through an extensive examination of key driving characteristics that have a proven correlation with insurance losses, including smooth driving, speed responsibility, driving time of day, consistent driving and time behind the wheel." The News Release noted that "Blue Link connected car services are now available on the entire Hyundai lineup (2018 model year and newer)." It further stated, in a footnote, that "Your data is shared with Verisk and you will receive a Verisk Driving Score only if you are opted into data sharing."[8] The News Release did not mention that drivers would have been automatically enrolled in Driving Score simply by using Bluelink.

18.     According to Hyundai's website, the Bluelink connection service that enables telematics "launched on the 2012 Sonata and is currently available on most 2013 through 2023 Hyundai models (excluding IONIQ 6). Vehicles later than 2013 that are not equipped with Bluelink include 2013 - 2017 Accent, 2013 Elantra sedan and 2013 Tucson. Bluelink+ launched with the 2023 IONIQ 6 and will be available on all 2024 Hyundai models moving forward."[9]

19.     As of February 8, 2024, Hyundai provided information about its "Driving Score" on its website, stating: "The Hyundai Driving Score uses your vehicle's sensors to collect data that summarizes your overall driving style in a way

---

[8] https://www.hyundainews.com/en-us/releases/3281 (last accessed May 17, 2024).

[9] "Introducing Bluelink+ ,"
https://www.hyundaiusa.com/us/en/bluelinkplus#:~:text=Bluelink%20launched%20on%20the%202012,Elantra%20sedan%20and%202013%20Tucson (last accessed May 16, 2024).

that is relevant and usable to insurers." The website specified that the Hyundai Driving Score was a "service provided by Bluelink." The website further stated: "If you do not want to participate in the driving score program at all, you do not have to. Simply opt-out in your MyHyundai account by clicking on the drive score permissions link."[10] The webpage did not mention that drivers would have been automatically enrolled in Driving Score simply by using Bluelink.

20.    On the same day that *The New York Times* article was published (March 11, 2024), Hyundai suspended the Driving Score program and modified its website to state that "[t]he Hyundai Driving Score is currently undergoing updates for improvements. We'll notify you once it's back."[11]

21.    By April 24, 2024, Hyundai had officially discontinued the Driving Score program, and modified its website to state that "The Hyundai Drive Score program has been discontinued."[12]

22.    According to Hyundai's website as of May 16, 2024, "[t]he option to share driving habits data with auto insurers is no longer available with the discontinuation of the program. . . . [A]ll customers have been opted out and there is

[10] "What is a Hyundai Driving Score?,"
https://web.archive.org/web/20240208102439/https://owners.hyundaiusa.com/us/en/resources/blue-link/what-is-a-hyundai-driving-score (last accessed May 16, 2024).

[11] "What is a Hyundai Driving Score?,"
https://web.archive.org/web/20240311231530/https://owners.hyundaiusa.com/us/en/resources/blue-link/what-is-a-hyundai-driving-score (last accessed May 16, 2024).

[12] "Hyundai Drive Score,"
https://web.archive.org/web/20240424014524/https://owners.hyundaiusa.com/us/en/resources/blue-link/what-is-a-hyundai-driving-score (last accessed May 16, 2024).

no need to actively unenroll," and "existing Drive Score data will no longer be accessible."[13]

Verisk Obtains Driving Behavior Data from Hyundai and Sells It to Auto Insurers

23.    The point of collecting the driving behavior data is to sell it, ultimately to auto insurance companies. According to *The New York Times*, after data brokers like "Verisk get data from consumers' cars, they sell information about how people are driving to insurance companies."[14]

24.    Verisk's partnership with Hyundai started in April 2018. On April 17, 2018, Verisk released the following statement from its Jersey City, New Jersey headquarters, describing the initiation of its partnership with Hyundai: "Verisk (Nasdaq:VRSK), a leading data analytics provider, today announced that Hyundai Motor America has signed an exclusive agreement to join the Verisk Data Exchange™. As a participating automaker, Hyundai will supply Verisk with driving behavior data from its consenting connected car owners. . . . Hyundai owners and lessees will gain access to their Verisk Driving Score™, a simple metric that assesses individual driving behavior. Insurers can use scores from the Verisk Data Exchange to support usage-based insurance (UBI) programs through a related rating rule available for use in 42 states and the District of Columbia. . . . The exchange now has 3.3 million cars with more than 36.5 billion miles of driving behavior data and is growing at more than 150,000 vehicles every month."[15]

---

[13] "Hyundai Drive Score," https://owners.hyundaiusa.com/us/en/resources/blue-link/what-is-a-hyundai-driving-score (last accessed May 16, 2024).

[14] "Automakers Are Sharing Consumers' Driving Behavior With Insurance Companies," *The New York Times*, March 11, 2024, https://www.nytimes.com/2024/03/11/technology/carmakers-driver-tracking-insurance.html (last accessed May 16, 2024).

[15] "Hyundai Joins the Verisk Data Exchange," April 17, 2018, https://www.verisk.com/company/newsroom/hyundai-joins-the-verisk-data-

25.    On June 23, 2021, Verisk released another statement from its Jersey City, New Jersey headquarters, announcing that it had "launched the next generation of its advanced telematics scoring model: The DrivingDNA® Score. . . . Insurers can use the DrivingDNA Score to deliver an enhanced UBI purchase experience to over 8 million connected car drivers who have consented to share their driving behavior data with the Verisk Data Exchange. When these eligible drivers begin a quote, their score and personalized discounts can be calculated immediately at point of sale, without the need for lengthy driving observation periods. . . . The Exchange works with numerous automotive manufacturers - including General Motors, Honda, Hyundai, and Ford – and applies advanced analytics and artificial intelligence to generate insights that enable superior decision-making across the life cycle of insurers' telematics programs."

26.    As of February 9, 2023, Verisk announced, from its Jersey City, New Jersey headquarters, that Defendants had "renewed [their] agreement in which Verisk will analyze telematics data from [purportedly] consenting owners of Hyundai and Genesis vehicles."[16]

27.    Verisk stopped receiving driving behavior data from Hyundai on April 9, 2024. Verisk's website, on the page relating to Fair Credit Reporting Act ("FCRA") forms, contains an "Important Notice to Consumers regarding Driving Behavior Reports." The notice states that "Verisk no longer receives driving behavior data from automakers to generate Driving Behavior Data History Reports. Verisk no longer provides Driving Behavior Data History Reports to insurers. If

exchange/ (last accessed May 16, 2024).

[16] "Verisk Remains Hyundai's Exclusive Provider of Telematics Data to Insurers," February 9, 2023, https://www.globenewswire.com/en/news-release/2023/02/09/2605077/0/en/Verisk-Remains-Hyundai-s-Exclusive-Provider-of-Telematics-Data-to-Insurers.html (last accessed May 16, 2024).

you're interested in receiving a copy of your Driving Behavior Data History Report, please click on the link at the bottom of the page. The driving behavior related data Verisk can offer you will vary by auto manufacturer." The notice states that for Hyundai, "Verisk stopped receiving driving behavior data to produce Driving Behavior Data History Reports as of April 9, 2024."[17]

28.    The driving behavior data that Verisk sells to auto insurers, and its purported Verisk Driving Score and Driving DNAScore metrics, are not and cannot be reliable and accurate because they lack essential context, including the full context of road and traffic conditions, and who was actually driving the vehicle at any given time. Verisk itself describes the data as "driving behavior data" and not "driv**er** behavior data," acknowledging that it cannot be reliably linked to particular drivers.[18]

29.    Verisk has stopped selling driving behavior data because automakers such as Hyundai stopped proving it following press coverage (including the initial exposé by *The New York Times*). In its first quarter earnings call for investors on May 1, 2024, Verisk CFO Elizabeth Mann said that, "Regarding auto, due to recent changes in our data stores, we have decided to discontinue our existing telematics offering." An analyst from Morgan Stanley followed up, asking, "During the prepared remarks, you mentioned you're discontinuing the auto telematic offering. I was wondering, clearly, it's not generating much revenue for you, but like what prompted deciding to discontinue it. Was the data not valuable? Was it costly to maintain? Just any color there." Verisk CEO Lee Shavel responded to the question, saying, "The simple answer is that the entities that were providing that data to us decided to discontinue collecting that data. And so there was really not sufficient

---

[17] https://fcra.verisk.com/#/ (last accessed May 17, 2024).

[18] *Id.*

analytical value in that without the data that was being provided. And I think it's fair to assume that it's a function of some of the media attention to collect connected car data."[19]

Impact on Plaintiff and Class Members

30.    On or about April 22, 2022, Plaintiff purchased a 2022 Hyundai Ioniq 5 from Tustin Hyundai in Tustin, California.

31.    To the best of Plaintiff's recollection, he enrolled in Bluelink about a month after purchasing his Hyundai vehicle by completing the enrollment process through the "MyHyundai with Bluelink" app. He recalls that the Bluelink feature was activated on his vehicle at the dealership, where he was informed about certain Bluelink features and advised to complete enrollment. However, there was no disclosure at the time that opting into the program would result in the collection of his driving behavior data.

32.    Plaintiff was never informed that his vehicle was enabled to collect and disclose his driving behavior data to data brokers and ultimately auto insurance companies, nor that this driving behavior data would be collected and disclosed unless he opted out.

33.    Plaintiff did not affirmatively or specifically consent to the collection or disclosure of his driving behavior data through the Driving Score program, and would not have allowed Hyundai to have opted him into such a program had he known his driving behavior data would be collected and sold to Verisk, or by Verisk to auto insurance companies, for no compensation.

34.    Plaintiff and Class members have a reasonable expectation of privacy in, and while driving, their vehicles, and the surreptitious collection of their driving

[19] Verisk Q1 2024 earnings call transcript, available at https://investor.verisk.com/financials/quarterly-results/default.aspx (last accessed May 17, 2024).

behavior data, without their informed consent, is a gross violation of that reasonable expectation of privacy. On or about August 15, 2023, the Mozilla Foundation published an investigation of Hyundai's privacy and data collection practices, finding that "Hyundai collects a massive amount of detailed and sensitive data about you and what you do," including "geolocation, how fast you drive, whether you're using the seatbelts, your presets and use of your car's features, and when exactly you do these things." As of May 16, 2024, more than 80% of survey respondents ranked Hyundai's data collection practices as "super creepy" (the highest on a scale of "not creepy" to "super creepy").[20] *The New York Times* article exposing Defendants' conduct also referred to a source describing cars as a "privacy nightmare."

35.    Drivers in Hyundai online forums have panned Hyundai's data selling practices after they were exposed by *The New York Times* and other media, criticizing both the accuracy of the driving behavior data and the manner in which it was collected. In one thread beginning on March 14, 2024, a user wrote: "[A] company that collects and sells personal and driving data surreptitiously (as Hyundai appears to be doing) deserves to be treated very carefully by customers. If they are willing to do this, then in what other ways are they treating their customers in a less than open and above-board manner? I also wonder about the potential for error in calculating a 'Risk Index' based on unknown criteria. As an example, consider the 'Rest Alert' that my Kona gives me periodically. I get these for no apparent reason. Typically in mid day and with never than more than about an hour into a trip. I'm well rested and driving smoothly. Are these alerts being reported back to Verisk and damaging my Risk Index? Another example is hard braking to avoid running a yellow/red traffic light. I do this when a traffic signal changes as I'm approaching

---

[20] Privacy Not Included—Hyundai, https://foundation.mozilla.org/en/privacynotincluded/hyundai/ (last accessed May 16, 2024).

instead of running the yellow/red light. I think mine is the safer option. But it goes into the tally as a negative behavior, a hard braking event. Let's hope that someone who knows the system better than I do can explain how Hyundai is behaving more openly than I've been able to discover, and describes how one may opt out of this data sharing program without having to turn off BlueLink."[21]

36.    Comments from online Hyundai forums also confirm that Defendants' conduct affects insurance rates. In another thread beginning March 21, 2024, a commenter wrote: "I was with Liberty Mutual up until this February. Bought a [Hyundai] Santa Cruz last May and notice the driving score in the app then and turned it off. Bought my new Sonata in June and made sure when it was added to Bluelink that the driving score was still off. This February at renewal my insurance went from $1600 a year to $2300. Verisk was called and Hyundai has been sharing the drive info on both vehicles."[22]

37.    Plaintiff and Class members have been harmed by the invasion of their privacy, and the misappropriation and loss of control of their personal driving behavior data, the collection of which they never explicitly authorized, and for which they were never compensated, and in a manner that increased the risk that they could be further harmed by increased auto insurance premium rates.

38.    Defendants concealed the conduct alleged herein such that Plaintiff and Class members could not have discovered it earlier through reasonable diligence.

## CLASS ACTION ALLEGATIONS

39.    Plaintiff brings this suit as a class action on behalf of himself and all others similarly situated pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3).

---

[21] https://www.hyundai-forums.com/threads/are-you-aware-that-hyundai-is-sharing-your-personal-and-driving-data-with-insurance-companies-via-verisk.712760/ (last accessed May 17, 2024).

[22] https://www.hyundai-forums.com/threads/insurance-rates-incresed.712903/ (last accessed May 17, 2024).

40.     Plaintiff seeks to represent a class of all persons in the United States whose Hyundai, Genensis, or Ioniq vehicles collected and disclosed their driving behavior data to third parties such as Verisk or auto insurance companies (the "Class"). Plaintiff also seeks to represent a subclass of all persons in California whose Hyundai, Genesis, or Ioniq vehicles collected and disclosed their driving behavior data to third parties such as Verisk or auto insurance companies (the "California Subclass").

41.     Unless specifically indicated otherwise, all allegations herein concerning the "Class" include and apply equally to each Class and each Subclass, individually and collectively.

42.     Upon completion of discovery with respect to the scope of the Class, Plaintiff reserves the right to amend the Class definitions.

43.     Excluded from the Class are Defendants, their parents, subsidiaries and affiliates, directors and officers, and members of their immediate families.

44.     The members of the Class are so numerous and dispersed that joinder is impracticable.  Hyundai has sold over a million vehicles in the United States during the time period relevant to the claims raised herein.[23]  The precise number of Class members and their identities are unknown to Plaintiff at this time but can be determined through discovery.

45.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members of the Class, including, but not limited to:

     a.  whether Defendants failed to disclose adequately their collection and disclosure of driving behavior data;

---

[23] https://www.hyundainews.com/en-us/releases?category_ids=382&categories=sales+releases&page_title=sales_releases (last accessed June 3, 2024).

b.  whether Defendants failed to obtain informed consent to collect and disclose driving behavior data;

c.  whether Defendants' conduct violated the federal Wiretap Act;

d.  whether Verisk's conduct violated the federal Fair Credit Reporting Act;

e.  whether Verisk's conduct violated the New Jersey Consumer Fraud Act;

f.  whether Defendants' conduct violated the California Invasion of Privacy Act;

g.  whether Defendants were unjustly enriched, and if so, in what amount;

h.  the measure of statutory damages recoverable;

i.  whether Defendants are guilty of oppression, fraud, or malice;

j.  whether Defendants are responsible for punitive damages and, if so, the measure of punitive damages to be assessed against Defendants.

46.  Plaintiff's claims are typical of the claims of the Class because he purchased a Hyundai vehicle and was not informed of, and, thus did not knowingly consent to, the collection or disclosure of his driving behavior data.

47.  Plaintiff will and adequately represent and protect the interests of Class and has no interests antagonistic to those of other Class members.  Plaintiff is committed to the vigorous prosecution of this action and has retained counsel experienced in litigation of this nature.

48.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because it would be impractical and unduly burdensome for each of the individual Class members to bring a separate action. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the respective Class members to seek redress for the wrongful conduct alleged.  Plaintiff

knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action. Moreover, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

49.    Class certification is also appropriate because there is a readily identifiable class on whose behalf this action can be prosecuted. Class members are readily ascertainable from Defendants' records. A notice of pendency or resolution of this class action can be provided to Class members by direct mail, email, publication notice, or other similar means.

50.    Defendants' disclosures, and/or lack thereof, to all Class members were uniform. To the extent reliance is an element of any of the claims asserted herein, Plaintiff and all Class members uniformly have relied on Defendants' conduct.

## CAUSES OF ACTION

## COUNT I

### Violation of the Wiretap Act

### 18 U.S.C. § 2510 *et seq.*

### Against All Defendants on Behalf of the Class

51.    Plaintiff incorporates all foregoing factual allegations.

52.    Defendants, by their conduct as alleged herein, violated the Wiretap Act, as amended by the Electronic Communications and Privacy Act of 1986 ("ECPA"), which subjects to suit any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication" (18 U.S.C. § 2511(1)(a)); or who "intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason

to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection" (18 U.S.C. § 2511(1)(c)); or who "intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection" (18 U.S.C. § 2511(1)(d)).

53.    Plaintiff and Class members were not aware of, and did not consent on an informed basis to, the interception of their driving behavior data.

54.    As to the Class, Defendants' conduct was undertaken for the purpose of committing a criminal or tortious act within the meaning of 18 U.S.C. § 2511(2)(d), to wit, with the purpose of intentionally interfering with prospective contractual relations between Plaintiff and Class members, on the one hand, and auto insurance companies, on the other hand. *See* Restat. 2d of Torts, § 766B ("One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.").

55.    As to the Class, Defendants' conduct was undertaken for the purpose of committing a criminal or tortious act within the meaning of 18 U.S.C. § 2511(2)(d), to wit, with the purpose of committing fraudulent concealment and nondisclosure. *See* Restat. 2d of Torts, § 511.

56.    As to the Class, Defendants' conduct was undertaken for the purpose of committing a criminal or tortious act within the meaning of 18 U.S.C. § 2511(2)(d), to wit, with the purpose of committing conversion. *See* Restat. 2d of Torts, § 511.

57.    As to the California Subclass, Defendants' conduct was undertaken for the purpose of committing a criminal or tortious act within the meaning of 18 U.S.C. § 2511(2)(d), to wit, violations of the California Invasion of Privacy Act, Cal. Penal Code § 630 et seq.

58.    Defendants' conduct was intentional because Defendants desired to cause the consequences of their acts, or believed that those consequences were substantially certain to result therefrom. Restat. 2d of Torts, § 8A.

59.    Plaintiff and Class members are entitled to relief pursuant to 18 U.S.C. § 2520, including such preliminary and other equitable or declaratory relief as may be appropriate; any profits made by Defendants as a result of the violation; statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000; punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

## COUNT II

### Violation of the Fair Credit Reporting Act

### Against Defendant Verisk on Behalf of the Class

60.    Plaintiff incorporates all foregoing factual allegations.

61.    The purpose of the Fair Credit Reporting Act ("FCRA") is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b).

62.    Verisk is a consumer reporting agency, and the driving behavior data collected by Verisk and provided to auto insurance companies are consumer reports, within the meaning of the FCRA. 15 U.S.C. § 1681a.

63.    Verisk willfully violated the FCRA by failing to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). The driving behavior data is not and cannot be reliable and accurate because it lacks essential context, including the full context of road and traffic conditions, and who was actually driving the vehicle at any given time.

64.    For each and every willful violation of the FCRA, Plaintiff and the Class members seek actual damages; statutory damages of not less than $100 and not more than $1,000; punitive damages as the Court may allow; and reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1681n(a).

## COUNT III

### Breach of Quasi-Contract and Unjust Enrichment

### Against All Defendants on Behalf of the Class

65.    Plaintiff incorporates all foregoing factual allegations.

66.    Defendants obtained a benefit from Plaintiff and Class members by surreptitiously acquiring their driving behavior data, which they sold for profit.

67.    As a result of Defendants' conduct, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class and Subclass.

68.    Defendants' unjust enrichment can be remedied by ordering Defendants to provide restitution, and to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and the Class, all proceeds received from selling the data of Plaintiff and the Class as a result of the unlawful and/or inequitable conduct described herein.

69.    Plaintiff and members of the Class have no adequate remedy at law.

## **COUNT IV**

### **Violation of the New Jersey Consumer Fraud Act**

### **Against Defendant Verisk on Behalf of the Class**

70.     Plaintiff incorporates all foregoing factual allegations.

71.     The New Jersey Consumer Fraud Act ("NJCFA") provides: "The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . . " N.J.S.A. §56:8-2.

72.     As described above, while engaging in trade or commerce within the State of New Jersey during the time period relevant hereto, Defendant Verisk surreptitiously collected Plaintiff and Class members' driving behavior data, with the intent to sell that data to auto insurance companies, to Defendant's benefit and Plaintiff's and Class members' potential detriment.

73.     Plaintiff and the Class have been injured as a direct and proximate result of Defendant Verisk's violations of the NJCFA.

74.     Plaintiff and the Class are entitled to pursue a claim against Defendant Verisk pursuant to N.J.S.A. §§56:8-2.11, 56:8-2.12 and/or 56:8-19 and obtain equitable relief, including disgorgement, to remedy Defendant Verisk's violations of the NJCFA, as well as for attorney's fees and costs.

## COUNT V

### Violation of the California Invasion of Privacy Act

### Against All Defendants on Behalf of the California Subclass

75.    Plaintiff incorporates all foregoing factual allegations.

76.    By collecting and disclosing Plaintiff's and Class Members' driving behavior data without their informed consent, Defendants violated the California Invasion of Privacy Act, Cal. Penal Code § 630 et seq., including Cal. Penal Code § 631(a), which makes liable anyone who "reads, or attempts to read, or to learn the contents" of a communication "without the consent of all parties to the communication . . . or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done" the foregoing; and Cal. Penal Code § 637.7, which provides that "[n]o person or entity in this state shall use an electronic tracking device to determine the location or movement of a person."

77.    Plaintiff is entitled to bring this action and seek to recover damages in the amount of five thousand dollars ($5,000) per violation, pursuant to Cal. Penal Code § 637.2 (under which "it is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages").

78.    Plaintiff also seeks punitive damages pursuant to Cal. Civ. Code § 3294 because Defendants are guilty of malice, oppression, and/or fraud as defined therein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests that the Court award the following relief:

79.    Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23, appoint Plaintiff as representative of the Class, and designate the undersigned as Class counsel;

80. Declare Defendants' conduct unlawful;

81. Award Plaintiff and the Class appropriate equitable relief, including disgorgement;

82. Award Plaintiff and the Class statutory damages;

83. Assess punitive damages against Defendants;

84. Award Plaintiff and the Class attorneys' fees and costs; and

85. Grant such other relief as the Court may deem just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff and the Class demand a trial by jury on all issues so triable.

Dated:      June 14, 2024

Respectfully submitted,

**WOLF POPPER LLP**

By: /s/ *Philip M. Black*
Philip M. Black (SBN 308619)
pblack@wolfpopper.com
845 Third Avenue, 12th Floor
New York, NY 10022
Telephone: (212) 759-4600

***Attorneys for Plaintiff***